## Jesse Claude NEWMAN and Jane Newman, Appellants–Plaintiffs,

v.

## David Harreld HUFF, Thelma June Palmer, Cleis Perry, Laura Roberts, The Estate of Alta M. Henderson, Deceased, and Donald Alfred Jefferson as Executor of The Estate of Alta Marie Henderson, Deceased, Appellees–Defendants.

### No. 12A02–9210–CV–464.

Court of Appeals of Indiana, Second District.

April 19, 1994.

Rehearing Denied May 27, 1994.

---

George G. Ponton, Frankfort, for appellants.

Robert Little, Brookston, for appellees.

SULLIVAN, Judge.

In the spring of 1983, Alta Marie Henderson (Marie) told Jesse and Jane Newman (Newmans) that she wished to sell rental property located at 6002 Fullerton Avenue, Buena Park, California.[1] Marie felt she could no longer manage or maintain the units due to declining health. Prior to speaking with the Newmans, Marie had investigated selling the property and had obtained an appraisal of $260,000. Marie explained that she preferred a purchase arrangement whereby she could receive monthly income for life because she believed a cash sale would impose detrimental tax consequences upon her.

On April 6, 1983, the Newmans agreed to purchase the property for the appraised amount (less a $16,000 commission), with $19,000 down and the balance of $225,000 payable by a note at prevailing interest rates. The note specifically required that interest *only*, as opposed to principal and interest, be paid in monthly installments of $2,062.50. The balance of the note was due in ten or fifteen years at the Newmans' option. Marie also agreed that, so long as she received timely monthly interest payments, the unpaid balance of the note would be forgiven upon her death. At this time, Marie declined to put this portion of the agreement in writing, but promised to do so after the real estate closing.

On January 3, 1984, the real estate transaction was closed.[2] At the January 3 closing, Marie conveyed title to the Newmans by a grant deed. The Newmans immediately executed a note secured by a deed of trust to the trustee, Grover Escrow Corporation. The trustee was to reconvey title to the Newmans upon payment of the note. At this time, Marie re-acknowledged her commitment to release the trust deed to the Newmans upon her death.[3] Shortly thereafter, on January 19, Marie executed a will providing that the balance of the note "shall be at once and then forgiven" upon her death and that the New-

1. The Newmans met Marie in the early 1970's in the course of an unrelated real estate transaction. Through the years, their relationship matured into friendship. The Newmans and Marie regularly dined together and exchanged holiday gifts. Jesse Newman also assisted Marie by driving her to the grocery store, to several banks, and to various offices for appointments. Jesse was granted, but never exercised, a power of attorney on Marie's behalf.

2. After the April 6 discussion concerning the terms of the sale, the Newmans had the necessary paperwork drafted. Apparently, the closing was delayed for several months because Marie's health improved in the interim and she was able to maintain the property.

3. The Newmans explained that Marie intended this reconveyance because the terms of the note only required interest payments to be made during Marie's life. According to the Newmans, the optional note extension was also designed to coincide with Marie's life expectancy, thereby providing her a steady stream of income for life.

mans would take the property "free and clear of any obligation to [Marie's] estate." CV464–Record at 73. A subsequent will, executed on April 4, 1986,[4] reiterated that Marie intended to honor a contractual obligation that the balance of the note arising from the sale of the Buena Park property be "given" to the Newmans "in accord with a contractual agreement made when [she] sold these units to Mr. Newman but never put in writing." CV464–Record at 111. The Newmans contend that this provision memorialized the representations Marie made when the Newmans agreed to purchase the property in April and which Marie confirmed at the January, 1984 real estate closing.

The Newmans regularly forwarded monthly interest payments to Marie through her conservator. The Newmans continued paying monthly interest installments until July, 1991, when they learned of Marie's death two months earlier. The Newmans ceased direct payments,[5] relying upon their understanding that the remaining debt was cancelled at Marie's death.

The Newmans appeal two decisions of the Clinton Circuit Court, now consolidated for review,[6] which effectively denied their claim based upon the alleged contract to take the

---

4. At the pre-appeal conference in this matter, the parties disclosed that the Newmans are presently contesting the probate of a will executed by Marie in Indiana on February 27, 1987. The Newmans contend the April 4, 1986 Will is Marie's last will and testament.

5. During the pendency of these proceedings, the Newmans are depositing the monthly interest payments into a California trust account of the Alta M. Henderson Estate. The Newmans are the trustees of this account.

6. Pursuant to this court's Order and the parties' stipulation, the Newmans' appeal filed under Cause No. 12A02–9303–CV–107 (CV–107) is consolidated with the Newmans' appeal filed under Cause No. 12A02–9210–CV–464 (CV–464). In CV–464, the Newmans sought the return of any payments made and funds expended and the reasonable value of services rendered or, in the alternative, specific performance of the forgiveness of the note and delivery of title. In CV–107, the Newmans sought specific performance of the agreement to devise the unpaid balance of the note or $225,000.

7. Procedurally, in CV–464, the legatees filed a motion to dismiss, which the trial court granted, for failure to state an actionable claim. Pursuant

---

Buena Park real estate free and clear of the outstanding promissory note at Marie's death. Pursuant to the pre-appeal conference, we address the following issues of the consolidated appeal:

I. Whether the Statute of Frauds, which renders oral contracts to make a will or to devise or bequeath property unenforceable, is satisfied by the April, 1986 Will of Alta Marie Henderson, executed in California, but alleged to have been subsequently revoked by a will probated in Indiana; and

II. whether the alleged contract, as a matter of law, failed for lack of consideration?

We reverse.

## I. *1986 Will*

■ The Newmans contend that the trial court erred in determining, as a matter of law,[7] that the 1986 Will fails to meet the requirements of the Statute of Frauds. The Estate argues that the 1986 Will lacks the specificity necessary to identify the terms, identities or obligations of the parties to the alleged contract.[8] The dispute centers upon the following provision in the 1986 Will:

---

to Ind. Trial Rule 12(B)(6), such a motion shall be treated as one for summary judgment because the Newmans submitted materials outside of the pleadings, including real estate documentation, affidavits, and depositions, for the court's review. In CV–107, the trial court granted summary judgment in the Estate's favor. Thus, we apply the same standard in this consolidated appeal as the trial court in reviewing grants of summary judgment. *Delk v. Bd. of Comm's of Delaware County* (1987) 2d Dist. Ind.App., 503 N.E.2d 436, 438 (summary judgment appropriate when there is no genuine issue of material fact and the movant is entitled to judgement as a matter of law).

8. Parenthetically, we note that the parties' identification of the contract in question as a contract to make a will or a contract to devise or bequeath property may be somewhat of a misnomer. As will be discussed, *infra*, we do not decide the issues before us based upon a theory of an independent promise to make a testamentary disposition of property; rather, the single inquiry is whether the terms of the initial agreement concerning the sale of the real estate provide for a disposition of the property before payment of the principal can be made. *See Copeland v. Summers* (1894) 138 Ind. 219, 35 N.E.

"Further any note still owing to me or my estate by Jesse Claude NEwman [sic] and Jane Newman shall be given to Jesse Claude and Jane Newman as part of their bequest from my estate. It is my intention to collect this note which arises from the sale of 6002 Fullerton Ave[.] in the city of Buena Park. My executor shall be directed to reconvey the title to the trustor Jesse Claude Newman and Jane Newman. This gift is in accord with a contractual agreement made when I sold these units to Mr[.] Newman but never put in writing. I intend that this contractual obligation shall be honored." CV464–Record at 111.

 The Statute of Frauds requires certain contracts to be in writing and to be signed by the party to be charged. I.C. 32–2–1–1 (Burns Code Ed.1980). A writing that sets forth the subject matter and terms of a contract with sufficient certainty, without recourse to parol evidence, satisfies the Statute of Frauds. *National By–Products, Inc. v. Ladd* (1990) 4th Dist. Ind.App., 555 N.E.2d 518. *See also Smith v. Hunt* (1912) 50 Ind. App. 592, 599, 98 N.E. 841 (in a contract action governed by the Statute of Frauds, a writing containing the terms of such contract sufficiently establishes the contract even if written after the contract was performed). Several writings may constitute a " 'written memorandum' " if each writing is signed by the party to be charged and if each writing indicates that it is related to the same transaction. *Block v. Sherman* (1941) 109 Ind. App. 330, 339, 34 N.E.2d 951 (applying *Restatement of Contracts* § 207, p 278 (1932) rule that a memorandum "may be any document or writing, formal or informal, signed by the party to be charged . . ."). Further, it is well established that the "description of the subject-matter may be wholly or partially contained in an auxiliary writing, which, if referred to in such a manner as to establish the connection, becomes a constituent part of the memorandum. . . ." *Block, supra,* at 335–36, 34 N.E.2d at 953 (quoting Pomeroy's *Specific Performance of Contracts,* 3 ed., § 90, p. 217).

The 1986 Will evinces the existence of an agreement between Marie and the Newmans without recourse to parol evidence. The 1986 Will references the sale of property located at 6002 Fullerton Avenue. The sale involved payment by promissory note. The identification of the Newmans as "trustor" suggests that title to the real estate was made subject to a deed of trust at the time of the sale. Ultimately, title to the property was to be reconveyed to the Newmans upon Marie's death as a means of carrying out a "contractual obligation" which Marie intended to honor. We accept, and the Estate does not seem to question, that the aforementioned documents related to the real estate transaction satisfy the Statute of Frauds. Similarly, there is no dispute that the real estate sale, promissory note, and trust arrangement had been consummated before the execution of the 1986 Will.[9]

 From our present vantage, however, it appears that all of the terms of the real estate contract were not reduced to a writing until, *at the very earliest,* Marie executed a will on January 19, 1984 [10] directing that the

514 (construing deed, contract, and will together when ascertaining parties' intent does not necessarily require that documents be regarded as testamentary in nature; in fact, the will here emphasized that the terms of a pre-existing contract were to be honored).

9. That the specific terms of the real estate transaction do not appear verbatim in the Will is of no moment in the instant case. *Block, supra,* 109 Ind.App. at 336, 34 N.E.2d at 953 (wherein we stated, "It is often the case that the terms of the contract are not all contained in any one paper."). Nor are we faced with the question, addressed in *Block, supra,* whether signed *and* unsigned documents may be construed together in ascertaining the terms of one contract. Here, all of the necessary terms (particularly as those terms relate to the parties' obligations) may be gleaned from the real estate documents signed by Marie and the Newmans at the January 3 closing.

10. The January 19 Will provided: "I further direct that first from my estate that note and trust deed of which I am beneficiary and Mr[.] Jesse Claude and Jane Newman are trustors and obligors shall first be deducted. At my death any balance then owing on that note and trust deed shall be at once and then forgiven. My executor is directed to make a reconveyance of said trust deed. The property which secures the payment of said note consists of eight units of apartments and is located at 6002 Fullerton Avenue in the city of Buena Park. It is my intention that Jesse Claude and Jane Newman shall take this proper-

Newmans take the property free and clear of her estate. Prior to January 19, the contract was merely a "parol contract" and was unenforceable under the Statute of Frauds. *National By–Products, supra,* 555 N.E.2d at 520 (citing *Sheldmyer v. Bias* (1942) 112 Ind.App. 522, 45 N.E.2d 347, for the proposition that a contract leaving an essential term thereof to be shown by parol evidence is a parol contract).

▆▆▆ However, by executing the will according to her promise, Marie memorialized that portion of her agreement ensuring that the Newmans would take title to the property free and clear upon her death. Marie had done all that was required of her to perform her agreement with the Newmans. *Cf. In re Estate of Von Wendesse* (1993) 1st Dist. Ind. App., 618 N.E.2d 1332, *trans. denied.*[11] Although Marie made subsequent changes [12] to her January 19, 1984 Will, up to and including the 1986 Will, the provision relating to the note forgiveness and the title reconveyance of the Fullerton Avenue property to the Newmans remained intact. Even if the 1984 Will were to be disregarded and even if the 1986 Will was revoked by a subsequent will, as the Estate now contends, the 1986 Will survives as a written memorandum of the contract between Marie and the Newmans, thus satisfying the Statute of Frauds. *Cf. 72 Am.Jur.2d, Statute of Frauds,* 303, p. 821

("A will may serve as a memorandum of ... [a contract to devise] ... notwithstanding that it is not a valid will or is inoperative as a will in favor of the claimant or has been revoked." (citations omitted)).

Furthermore, it is apparent from the face of the 1986 Will that Marie's obligation to give free and clear title to the Newmans arose at the time of, and in conjunction with, the sale of the property to the Newmans. Contrary to the Estate's position, the terms, identities, and obligations of the parties to the parties' contract are fully disclosed. When read in combination, the real estate transaction documents *and* the provision in the 1986 Will sufficiently establish a "written memorandum" of the contract satisfying the Statute of Frauds.

## II. *Consideration*

We must now consider whether the contract was supported by consideration. The Newmans agreed to purchase the property from Marie and to make monthly interest payments to Marie during her life for a period of fifteen years. If Marie were still living at the end of the payment period, the Newmans would then pay the balance of the note. In exchange, Marie agreed to sell the property to the Newmans and, if she died before the fifteen years, to forgive the bal-

---

ty free and clear of any obligation to my estate." CV464–Record at 73.

This provision does, in fact, track the Newmans' understanding of the promise Marie made to them according to their April 6 agreement regarding the terms of the sale of the Buena Park property. In her affidavit, Angela Bevins, the president of the escrow company who was present at the real estate closing, stated that Marie agreed to forgive the note and reconvey title to the Newmans upon her death, thus reaffirming her commitment to this part of the bargain. Nathan David Grady, who drafted the January 19 Will, likewise testified that Marie told him, "This [agreement to forgive the debt and to reconvey title] is a contract oral agreement that I have and I have to do it and I want to do it." CV464–Record at 122.

**11.** In *Von Wendesse,* a daughter sought to enforce an alleged oral contract under which her father would make a will devising his estate to a named beneficiary if that beneficiary would, in turn, devise the balance of her estate to the father's children. The father executed his will as

did his beneficiary. Shortly after the father died, the beneficiary revoked the will in which she previously devised her estate to the children and made a new will. Our First District noted that a person who makes an oral contract to make a devise by will and who subsequently follows through and executes a will in accordance with that promise "had done all which was humanly possible for [the promisor] to do to complete [the] performance, and the contract must be classified as an executed contract which was wholly unaffected by the Statute of Frauds." *Von Wendesse, supra* at 1336. The court also observed that if the contract to devise by will was "in writing, so as to satisfy the Statute of Frauds, or if it has been performed in such a manner as to be taken out of the statute, an action for its specific enforcement may be maintained, or an action for damages may be maintained in special cases." *Id.* (quoting *Roehl v. Haumesser* (1888) 114 Ind. 311, 15 N.E. 345).

**12.** Marie executed a republication and codicil to the January 19, 1984 Will on February 28, 1985 and again on July 23, 1985.

ance of the note and to reconvey title to the Newmans.[13]

The Estate maintains that even if the payments made to Marie constitute consideration for the sale of the property, the payments cannot "duplicitously reflect consideration for a separate, oral promise to do anything else." CV–464 Brief of Appellee at 16. Restated, the Estate argues that the real estate transaction and the oral agreement to forgive the note and reconvey the title were two separate contracts supported by but one consideration. Alternately, the Estate suggests that the provision in Marie's 1986 Will was merely a gift and, as such, was a unilateral, i.e., unenforceable, contract.

■ Concerning the Estate's first contention, we cannot agree that the 1986 Will was an afterthought to the sale of the property. Marie's promises to forgive the debt and to reconvey title at her death were integral parts of the original bargain struck by the parties. As previously discussed, *supra*, it matters not whether Marie's promises were reduced to a writing at the time of or after the real estate documents were executed. In retrospect, the 1986 Will does not stand alone. Rather, it is concomitant to the sale of the property and requires only that consideration which will support the contract as a whole.

It is neither novel nor incongruous for a party, on the one hand, to sell property and to receive a promissory note in exchange, and then, on the other hand, to later release the unpaid portion of the note. For example, *Cadigan v. American Trust Company* (1955) 1st Dist. Cal.App., 131 Cal.App.2d 780, 281 P.2d 332, presents a strikingly similar set of facts. In *Cadigan*, a landlord offered to sell property to her tenants, the Cadigans, for a small downpayment. The balance was to be paid at the same rate as the monthly rent. So long as the monthly payments had been made, the principal was to be cancelled upon the landlord's death and title to the property (being held in trust) was to revert to the Cadigans. The landlord told the Cadigans that she wished this arrangement "to reduce

her tax burden and to be relieved of the task of employing people to take care of her properties, adding that she had no relatives and would rather have her property go to her tenants than to the state." *Id.*, 281 P.2d at 334. The Cadigans executed a note for the unpaid balance of the purchase price as well as a deed of trust. Four months later, the landlord wrote a letter to the Cadigans confirming her prior oral representation that if the monthly installments were timely paid, the remaining balance would be cancelled upon her death.

In *Cadigan*, after determining that the promissory note, deed of trust, *and* the letter constituted one contract (the parties' final written memorial), the court reviewed whether consideration supported the contract. The court concluded that consideration flowing between the parties consisted of the promissory note upon the one hand and the promise to forgive the unpaid balance upon the landlord's death upon the other hand. The court explained, "The promise to remit the unpaid portion of the principal upon the death of the payee was an integral part of the bargain, the major inducement to the Cadigans to buy [the property]." *Id.* See also *Symonds v. Sherman* (1933), 219 Cal. 249, 26 P.2d 293 (letter pinned to promissory note stating the note was to be cancelled upon the payee's death was integral part of transaction and contract was supported by ample consideration).

■ Here, our inquiry is limited to whether valuable consideration existed to sustain the contract. The adequacy of the consideration is not relevant. See *Harrison–Floyd Farm Bureau Co-op v. Reed* (1989) 1st Dist. Ind.App., 546 N.E.2d 855, 857. There is evidence of the record before us that Marie wished to avoid adverse tax consequences, that she hoped to be relieved of the daily burden of managing rental property, and that Marie wanted the security of monthly income for life. The real estate transaction to which Marie assented was designed to address her particular concerns and was

---

**13.** Concerning the sales agreement, Mr. Newman testified that Marie said, "If you draw it up and will guarantee me that I'll have that income for the rest of my life ... [w]hen I'm gone, this property goes to you." CV464 Record at 271.

structured to meet her specific needs. Viewing the transaction *as a whole*, we cannot say that Marie did not receive the benefit of the bargain or that the contract lacked consideration. Thus, the parties entered into a contract fully supported by valuable consideration.

 We now address the Estate's second contention only to dispel the notion that the provision in the 1986 Will was a gift in the nature of a testamentary disposition. The Estate seizes upon the fact that in the 1986 Will the word "gift" follows upon the heels of the forgiveness of debt and the reconveyance of title. Admittedly, Marie might have selected a different or more unequivocal medium to memorialize her contract with the Newmans and to achieve the anticipated result.

Be that as it may, we must consider the language of the will in its entirety and in its proper context. First, the 1986 Will consistently indicates that the forgiveness and the reconveyance stem from and were tied to a contractual agreement. Second, even though Marie intended to collect the promissory note, according to the note all that Marie was to receive in the monthly payment was the interest due. Marie also gave the Newmans the option to extend interest payments from ten to fifteen years, possibly (and plausibly) expecting that she would never recoup the principal due upon the note. Thus, "forgiving" the balance seems more consistent with Marie's expectation to receive an income stream for life than with any desire to receive a lump sum payment of the purchase price for the property.

 One might equate the note cancellation with a gift, were it not for the existence of the parties' contractual agreement. But a contract may indeed incorporate a provision that disposes of the subject matter of the contract at a point in the future. To illustrate, in *Society of Missionary Catechists v. Bradley* (1942) 112 Ind.App. 556, 44 N.E.2d 209, Katheryn McNamara paid $2,000 to a charitable institution in return for its promise to pay interest upon the sum to her for life. The parties' agreement provided that upon Katheryn's death, the $2,000 would become the absolute property of the institution. The court concluded that the agreement was not testamentary in character because the contract was in effect and operated upon delivery and during Katheryn's lifetime, and not after her death. *Id.* at 560, 44 N.E.2d at 211. Title to the money had passed to the institution notwithstanding the fact that Katheryn could demand return of the funds upon proper notice during her lifetime. The court drew a distinction [14] between a contract and a testamentary disposition, emphasizing that a "contract contemplates performance, in part at least, during the lifetime and *some quantum* of present interest in the other party." *Id.* at 561, 44 N.E.2d at 212 (emphasis supplied).[15]

Moreover, in *Bradley*, Katheryn never made an outright gift of the money, but

---

**14.** Several jurisdictions have reached a comparable conclusion that disposing of property under a contractual arrangement does not make the disposition testamentary in nature. *See, e.g. McGrath v. McGrath* (1966), 107 N.H. 242, 220 A.2d 760, 762 (noting the "great weight of authority" supporting the validity of a contract that provides for the termination or extinguishment of debt upon one party's death as " 'merely a limitation, by agreement, on the purchaser's duty to pay' " rather than a testamentary disposition); *Wright v. Donaubauer* (1941) 137 Tex. 473, 154 S.W.2d 637 (proposal for payment of vendor's lien note included valid provision that the note would be cancelled upon the vendor's death).

In *Church of Jesus Christ of Latter Day Saints v. Scarborough* (1951) 10th Cir., 189 F.2d 800, 801, an annuity contract that paid the annuitant interest for life and that provided the church would retain funds on deposit as a "donation"

was upheld *even though* the agreement contained testamentary verbiage. Although the court conceded that the contract was "ineptly drawn," the contract was binding because the agreement "created a present obligation and was not subject to revocation." *Id.*

**15.** For a corresponding analysis, see *Wheeler v. Loesch* (1912) 51 Ind.App. 262, 99 N.E. 502. In *Loesch*, a father deeded land to his children on the same day he executed his will. The will mentioned the land, indicating that Loesch deeded the land that very day. The court stated, "If an instrument passes present title, but postpones enjoyment of the estate until the grantor's death, it is a deed. If both title and enjoyment are postponed, it is a will." *Id.* at 266, 99 N.E. at 503 (citations omitted). Thus, present interest having passed to the children, the transfer of land was a *fait accompli* before the execution of the will. *Id.*

required certain conditions be met during her lifetime. Such obligations, having been discharged by the institution, constituted consideration for the contract. Thus, the theory that the money was a gift was rejected. *Cf. Price v. Jones* (1886) 105 Ind. 543, 5 N.E. 683 (promissory note stating that one day after death of promisor a certain sum was to be paid was not an attempted testamentary disposition, but a promise to pay money).

Similarly, in *Bundrant v. Boyce* (1910) 47 Ind.App. 253, 255, 91 N.E. 968, 969, *trans. denied,* as part of a written contract, a church executed a promissory note payable in five years with interest to be paid annually to the payee of the note. The contract provided that if the money loaned to the church was not demanded before the death of the payee, the funds would be retained "as a *benefit and donation* from [the payee] to the [church]." (Emphasis supplied). *Id.* In holding the contract to be executory, the court stated:

> "The money, the subject of the contract, was delivered to the church, and was to be retained until the happening of a certain event. The church had a present interest in it, the right to use it as stipulated. That interest ceased or became absolute upon the doing or not doing of a certain act of the obligee. The demand stipulated for never having been made, the right to retain the money, so far as that right is to be determined upon the contract in suit, became absolute in the church.
>
> The liability of [the church] was not limited to an event which might happen after the death of the obligee. At the expiration of five years the payee of the note had the option to treat the note as a nullity or to enforce it. [The payee's] failure to exercise the right to enforce it was, in effect, a renunciation of the liability of [the church]." *Id* at 257, 91 N.E. at 970.

The majority apparently rejected the dissent's position [16] (which, interestingly, rested heavily upon the law of foreign jurisdictions) that the transaction was a promise to make a donation at the payee's death or a gift to take effect in the future. The majority opined that the facts might warrant a conclusion that the transaction was a gift because the property *passed to the church,* although the majority clearly indicated that the decision was not based upon a gift theory. *Id.* at 257–58, 91 N.E. at 970.

Here, the Newmans were bound to perform the terms of the contract during Marie's life. Further, the Newmans had been invested with, as *Bradley, supra,* requires, some quantum of present interest in the real estate. That the trust deed to the property was not to be reconveyed to the Newmans unless or until Marie died before the principal became due is simply a condition of the contract dependent upon the happening of a future event. *Bundrant, supra.* Clearly, the Newmans fulfilled their part of the contract and Marie received the benefits thereof.

Because the contract is supported by valuable consideration and required performance during Marie's lifetime, the forgiveness of the promissory note and the reconveyance of title are neither gifts nor invalid testamentary devises. Consequently, the trial court erred in dismissing the Newmans' complaint for specific performance of the contract and in granting summary judgment in the Estate's favor. This cause is remanded for a reconsideration of the terms of the contract and for an appropriate remedial action.

The judgment of the trial court is reversed and the cause remanded for further proceedings.

FRIEDLANDER and HOFFMAN, JJ., concur.

---

16. The dissenting opinion is printed separately at 47 Ind.App. 253, 92 N.E. 126.